FRITZ ELECTRIC COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Alvin Cox, Appellee).

Fifth District (Industrial Commission Division)   No. 5—87—0332WC

Opinion filed January 27, 1988.

Edward M. Vokoun, of Evans & Dixon, of St. Louis, Missouri, for appellant.

Serkland & Muelhausen, of Chicago (James C. Serkland, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Alvin Cox, filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*) for injuries allegedly sustained in the course of his employment with his employer, Fritz Electric Company. After determining that claimant had sustained an accidental injury which arose out of and in the course of his employment and resulted in a back strain which left the claimant with a permanent partial disability of 10% under section 8(d)(2) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.8(d)(2)), the arbitrator awarded the claimant 80$\frac{3}{7}$ weeks temporary total disability.

Both parties filed appeals from the arbitrator's decision. Following a hearing, the Industrial Commission reversed the arbitrator's decision in part, entering an award under section 8(d)(1) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.8(d)(1)) for partial disability from pursuing his usual and customary employment. Claimant was awarded $264.40 per week for 9 weeks; $75.84 per week for 31 weeks; $78.28 per week for 18 weeks; $282.25 per week for 8 weeks; and $282.25 per week for 42 weeks. The employer was also ordered to pay to the claimant 66$\frac{2}{3}$% of the difference between the average amount he is earning or able to earn, and what he would earn in the full performance of his trade for the duration of his disability. The Commission affirmed the arbitrator's award of temporary total disability.

The employer appealed to the circuit court of Jackson County. The circuit court confirmed the decision of the Industrial Commission in all respects. The employer appeals.

On appeal, the employer contends that the decision of the Industrial Commission awarding wage loss benefits under section 8(d)(1) to claimant is against the manifest weight of the evidence, or in the al-

ternative, if the wage loss award was proper, then the Commission erred in its calculation and assessment of those benefits. The employer also contends that the Commission erred in finding that a subsequent accident only temporarily aggravated the claimant's condition.

The claimant testified at the hearing before the arbitrator as follows. Claimant had been employed by Fritz Electric Company (Fritz) since 1980. Prior to May 1982, his health was excellent, although he had injured his back in 1960 and again in 1970. On neither of those occasions was he hospitalized, nor did he lose any time from work. While employed by Fritz, he was an electrical foreman, which required him to supervise the electrical personnel in the installation of all electrical systems in coordinating work with other crafts on the job. He was also required to do the work of a journeyman wireman in addition to supervising if there were less than six men on the job. While he worked for Fritz, he worked 50% as a supervisor and 50% as a journeyman. Physically, the job required him to lift up to 150 pounds, dig ditches, climb and scaffold work, and install electrical conduit, where the weight sometimes exceeded 150 pounds.

On May 13, 1982, while on a construction site at Southern Illinois University, claimant slipped on a metal stairway and fell on his low mid-back section. He felt extreme pain and numbness in his legs and arms but finished the day's work. The next morning he felt no improvement but reported for work. He worked for about an hour, although he was in much pain, and it was very difficult to bend, twist, or lift. He went home and contacted Dr. Carl Hauptmann, his family physician. Dr. Hauptmann examined him thoroughly, took X rays, and prescribed diatherm treatments. The X rays showed some degenerative disc disease at L1-L2 with marginal osteophyte formations, but no compression, spondylosis, or spondylolisthesis.

Claimant was treated with therapy, an exercise program, and medication until July 1982, when he was referred to Dr. John Sterne of Evansville, an orthopedist, who placed him in the hospital for two weeks. Claimant was treated with traction and physical therapy. When he was discharged, he was fitted with an orthopedic back brace. He remained under Dr. Sterne's care and was treated with medication and cortizone injected into the spinal area; however, there was very little improvement. On January 2, 1983, the claimant was hospitalized again and underwent a bone scan and a CAT scan, both of which were normal. Dr. Sterne referred the claimant back to Dr. Hauptmann on January 13, 1983. Claimant saw Dr. Hauptmann about once a month from January 13 through November 30, 1983. Claimant

also underwent physical therapy at Harrisburg Hospital for six weeks. At Fritz' request, he was examined by Dr. Marshall Conrad on March 7, 1983, and August 4, 1983.

On November 30, 1983, claimant began a job with Sullivan Electric Company. He obtained this job through the contacts he had made in the construction industry, as well as information that had been provided to him by Michaleen Maher, a rehabilitation specialist assigned to him by Fritz. He was employed by Sullivan as an assistant electrical superintendent and eventually was promoted to superintendent on February 1, 1984. His starting salary was $385 per week. It was increased to $660 per week as of February 1, 1984, and remained at that figure until he was laid off on January 4, 1985. His duties were nonphysical and included coordination of installation of electrical work and supervising of all personnel, purchasing materials, attending meetings, record keeping, and management.

Claimant continued to suffer back pain and leg pain while performing his duties for Sullivan. Then, on March 29, 1984, he slipped in some mud and "reinjured or aggravated the existing back injury." Dr. Hauptmann took him off work for six weeks. Claimant noted that he had slightly more pain in his legs than he had had previously but that he had had pain before in his legs. When he returned to work, he had a little more trouble bending or twisting. His back eventually returned to what it was prior to the second accident and his leg pain continued intermittently up to the present time. Claimant believed that his original back injury was aggravated by the March 29, 1984, accident. When he returned to work for Sullivan, he performed the same duties as prior to the second accident.

At the request of Fritz' insurance carrier, claimant was examined on May 5, 1984, by Dr. Otakar Machek, and on September 17, 1984, by Dr. Conrad, again at Fritz' request.

When his employment with Sullivan ended on January 4, 1985, claimant began drawing unemployment compensation at the rate of $180 per week. He also placed his name on the out-of-work list at the union. He was available for work within the limitations placed upon him by the doctors, i.e., the maximum weight he could lift was 20 pounds. When his name came to the top of the list, there was an opening of a temporary maintenanceman at Southern Illinois University, but he was not accepted for the job.

At the time of the hearing, claimant still felt back pain and had a problem bending and twisting. He needed pain medication continually.

In addition to his electrical contracting background, claimant is also an ordained minister and volunteered his time at his church on

Sundays. He took business courses at a college in Kentucky in 1979 and 1980. He is capable of supervising electricians, as well as performing the administrative and clerical work of an assistant superintendent, including the ordering of tools and supplies, the preparation of bids for projects up to $25,000, the coordinating of the service and installation of electrical equipment with local utilities and other contractors, and teaching electricity courses covering electrical theory, mathematics, instruments, meters, and equipment testing.

James E. Nolan testified on behalf of the claimant as follows. He is employed by the International Brotherhood of Electrical Workers, Local 702, as a business representative. From the period of November 30, 1983, to January 4, 1985, he estimated that 20 to 25% of his local electricians were out of work. Claimant's name came to the top of the out-of-work list in the latter part of May 1985. Even had he been accepted for the job at Southern Illinois University, he would have remained at the top of the list since that job was only a temporary one.

According to Nolan, the hourly rate of a journeyman was $18.61 per hour on November 30, 1983. It went down to $18.41 on February 4, 1984. By September 1, 1984, it had climbed to $18.51, and by March 1, 1985, it had returned to $18.61. A foreman earns 10% more than a journeyman.

Nolan had known claimant for 10 years and was familiar with the quality of his work, which he described as excellent. Claimant's employment status was generally that of a foreman because of his experience. Although as a foreman claimant would generally supervise, since most jobs were rather small, utilizing only about four men, claimant would occasionally do some of the work himself. It was not unusual for claimant to have to wait five months for his name to go to the top of the out-of-work list, since as a superintendent, he would be the last person laid off of a large job, and he would be signing the list behind 30 to 40 workers who had been laid off earlier. While in 1984, Nolan was able to place most of his electricians, in 1985, the amount of available work was down. Electrical work was also affected by the weather. Nolan also admitted that because of layoffs, a number of electricians did not work 52 weeks out of the year.

Walter W. Gausepoohl testified on behalf of Fritz as follows. He is employed by American Technologies, Inc., the parent company of Fritz, as credit manager and contract administrator. At the present time, he is in charge of the insurance department. The claimant began to work for Fritz on July 11, 1979, as an electrical foreman. His wage records showed earnings of $34,844.16 for the 52 weeks immediately preceding the accident of May 12, 1982. Claimant received increases

in salary due to union increases in May 1981, September 1981, and March 1982. Construction on the jobsite where claimant was injured was completed on August 5, 1982.

Gausepoohl stated that the job opportunities for electricians were presently very low. He had approximately nine other electricians working at the present time, whereas three years before his company had as many as 50 electricians employed. Fritz did not have any electrical projects in southern Illinois in 1984 or 1985. The work of electricians is also affected by the weather conditions. He does have electricians who do not or are not able to work a full year.

James R. West testified on behalf of Fritz as follows. He is employed by Sullivan Electric as general manager. Claimant was hired by Sullivan on November 30, 1983, at $385 per week. His salary was eventually raised to $660 per week as of January or February 1984. The present business climate for electricians is depressed, the amount of contractors and workers exceeding the work available. It has been this way for several years.

Claimant's work was always satisfactory, and if a job arose at a subsequent time, West would rehire him. West was aware of claimant's accident on March 29, 1984. Claimant missed about six weeks and then returned and resumed his usual duties. In his job, claimant was required to work and walk over various rough surfaces to inspect the job, as well as fill out progress reports and attend meetings. He did not have to perform any manual labor type of work. West recalled a conversation that he had had with the claimant sometime before the accident of March 29, 1984. The two were talking about their respective sons when the claimant volunteered that his son was still trying to learn farm work but that the claimant could "work circles around him." The claimant stated to West that he had been putting in fencing on his farm but he did not specifically state that he had been putting in the fence posts himself. West also stated that electrical work was affected by the weather.

The evidence deposition of Dr. Otaker Machek was admitted into evidence. Dr. Machek's specialties are rehabilitation and rheumatology. At the request of Fritz, he examined the claimant. During the examination, Dr. Machek observed that claimant tended not to flex and bend his back as much as the doctor thought that he was able to, showing an exaggeration of affect. When the claimant was distracted, he was able to perform full and normal range of motion in his work. He found no muscle spasm, no motor or muscle weakness, no sensory loss, nor any decrease in ankle reflexes. It was his opinion that the claimant was neurologically intact. He found no objective abnormal

clinical findings to support the claimant's various subjective complaints. Dr. Machek ordered an X ray, but changes noted on the X ray were old and predated the accident of May 12, 1982. He diagnosed a back strain which had been resolved without objective evidence of injury, impairment, or disability. In his opinion, the second accident of March 29, 1984, did not aggravate the claimant's condition and did not change it. According to Dr. Machek, the question of causation was very complicated in this case because of the claimant's prior history of back injuries while serving in the Navy, as well as in 1960 and 1970.

According to Dr. Machek, claimant had no permanent condition nor was he in need of any further treatment. Claimant was physically able to work and would certainly be able to perform the duties of an electrical superintendent. Further, Dr. Machek disagreed with the restrictions placed on the claimant by Dr. Conrad, finding that claimant could perform the work he was engaged in prior to the accident of May 12, 1982, with no restrictions. His final diagnosis was back strain which had been resolved.

The evidence deposition of Dr. Marshall B. Conrad was admitted into evidence at the request of the claimant. Dr. Conrad's specialty has been orthopedic surgery since 1954. At Fritz' request, Dr. Conrad examined claimant initially on March 3, 1983. He also examined him on August 4, 1983, and September 14, 1984.

At the March 3, 1983, examination, claimant complained of pain in his lower back which had begun after he fell at work in May 1982. Dr. Conrad found him to have a full range of motion on flexion, extension, and lateral bending in his back. All neurological signs were negative. Claimant did have a palpable muscle spasm. There was no nerve root involvement. Dr. Conrad examined X rays of claimant's spine and noted that they showed some narrowing of the disc space between L1 and L2 and some arthritic spurring, both of which were of long-standing origin and predated the accident of May 12, 1982. Dr. Conrad recommended that claimant continue the treatment previously prescribed for him. He felt claimant could return to work but, initially, should try to find something which would not unnecessarily stress his low back, particularly something which did not require bending or lifting. Further, Dr. Conrad temporarily restricted claimant from lifting anything over 20 pounds.

Dr. Conrad next examined claimant on August 4, 1983. Claimant admitted to some improvement in his symptoms. However, he complained of stiffness and soreness in his back when he first got out of bed in the morning but that those symptoms improved somewhat after he got moving around. He was still not able to go back to his reg-

ular job but got along reasonably well, as long as he did not have to do any bending or lifting. Upon a physical examination, there was no deformity but some muscle spasm. Claimant had flexion to 90 degrees, straight leg raising to 45 degrees, but this was not a positive neurological finding because the pain seemed to be localized in the back and did not affect the nerve roots. Dr. Conrad's diagnosis remained the same, and he recommended continued conservative treatment. Claimant could return to work but should avoid lifting anything that would aggravate his back symptoms. The 20-pound weight restriction was continued. If claimant's condition improved, the restriction could be lifted.

On September 14, 1984, Dr. Conrad again examined the claimant. Claimant informed him that he had fallen and again hurt his back. Since that time his symptoms had been worse. Sometime in August, he began to notice pain radiating into his right leg, which he had not had before. Dr. Conrad noted some palpable muscle spasm and some tenderness over the right sciatic notch. Dr. Conrad also noted the following changes since claimant's previous examination: a slight reversal of the lumbar spine, positive straight leg raising on the right at 60 degrees, a positive Leseque on the right, and reduced reflexes.

Dr. Conrad diagnosed the most recent injury as a sprain-type injury resulting from the slip and fall that had aggravated the back symptoms. The pain in his leg was typical of a sciatic pain on the right. However, he did not, at that time, show any localizing neurologic signs in terms of sensory loss, an absent reflex or any muscle weakness. Dr. Conrad could not make a diagnosis of a herniated disc, although some of claimant's complaints raised a question of some nerve root irritation. Dr. Conrad continued to recommend conservative treatment and protection from further injury.

Dr. Conrad was of the opinion that the accident of March 29, 1984, aggravated claimant's preexisting condition, based upon the fact that the second injury was of a type which could be expected to aggravate the problems he already had, that his symptoms were worse, and that there was some change in the physical findings. The doctor did feel that claimant could return to work, as long as he exercised caution to prevent further injuries and with some restrictions concerning his bending, lifting, and working in cramped areas. In the doctor's view, these restrictions were permanent, although prior to the second accident, they might very well have been temporary. While he had placed a 20-pound limit on what the claimant could lift, from a practical standpoint, provided claimant would learn how to do it in the proper way, he could handle up to 75 pounds but not beyond that. He

could bend and stoop, as long as he did it carefully and deliberately, and provided he did not have to do it repeatedly throughout the day. The same advice applied for climbing and walking over rough surfaces. Within the above restrictions, claimant could work as an electrical supervisor. He also could do jobs outside of the electrical trade based upon his experience and training.

The deposition of June M. Blaine was entered into evidence at Fritz' request. She is a certified rehabilitation specialist, and she had been employed as a vocational rehabilitation specialist for the previous five years.

Ms. Blaine first introduced and evaluated the claimant on April 15, 1986. She was aware of the work restrictions imposed on claimant and also of his history of injury and his physical complaints. In her opinion, claimant was employable. She based this opinion on claimant's 20 years of experience, not only as a journeyman electrician, but also in various management jobs including preparing bids, teaching electricians, supervision of personnel, administration, and clerical responsibilities. It was her opinion that claimant was employable in various types of managerial positions such as sales manager, safety manager, electrical supervisor, maintenance supervisor, or maintenance repair manager. She confirmed that these jobs offered gainful employment of 40 hours or more per week, and that they did exist in the area surrounding the claimant's county of residence.

Ms. Blaine conducted a labor market survey which identified nine specific jobs which fit some, though not all, of the various restrictions placed on claimant by Dr. Conrad and Dr. Machek. Of these jobs, two paid money comparable to that which claimant had been earning while employed by Fritz. Some of these potential employers would not reveal their rate of pay, so she was unable to determine whether they compare to his previous employment or not. She contacted claimant on June 3, 1985, and informed him of two job leads where there were immediate openings. She also developed other job leads in addition to those mentioned above. She has continued to work with claimant and last contacted him on June 25, 1985. At the present time, there was no supervisory foreman-type job available in southern Illinois, but there were other management-type jobs available for which the claimant was qualified.

The arbitrator awarded claimant temporary total disability for a period of 80³/₇ weeks at $403.12 per week. The arbitrator also found that claimant was not entitled to compensation pursuant to section 8(d)(1) of the Act. The arbitrator did award claimant $282.25 per week for 50 weeks pursuant to section 8(d)(2) of the Act.

Both parties appealed to the Industrial Commission. At the review hearing, claimant testified of his efforts since the arbitration hearing to obtain employment. Prior to August 30, 1985, his rehabilitation counselor, supplied to him by Fritz, had sent out close to 40 letters seeking employment. He himself had sent only three. None of the letters, however, had resulted in any job offers. Since August 30, 1985, he sent out another 10 to 12 letters, but he did not retain a copy of those letters. He admitted that he has not set up any job interviews although some of the employers contacted were in his area, while others were a considerable distance, nor had he interviewed with any contractors in or around his own or adjacent counties. He had not been rejected for work because of his back. He retained his union listing and was also on the list of those having special skills. He drew out the balance of his unemployment compensation based upon his ability to work on June 30, 1985.

The Industrial Commission reversed the decision of the arbitrator, finding that claimant was entitled to compensation under section 8(d)(1) of the Act. The Commission noted that Dr. Conrad had restricted claimant from working in a cramped position, from repeated bending, or lifting more than 15 to 20 pounds, or up to 75 if he were careful, and stated that claimant was unable to do a journeyman's work. The Commission's decision was confirmed by the circuit court, and this appeal followed.

Fritz contends that the decision of the Industrial Commission awarding claimant benefits under section 8(d)(1) is against the manifest weight of the evidence. Section 8(d)(1) provides in pertinent part as follows:

> "If, after the accidental injury has been sustained, the employee as a result thereof becomes partially incapacitated from pursuing his usual and customary line of employment, he shall *** receive compensation for the duration of his disability, subject to the limitations as to maximum amounts fixed in paragraph (b) of this section, equal to 66⅔ of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident." Ill. Rev. Stat. 1981, ch. 48, par. 138.8(d)(1).

The object of the above-cited provision is to compensate the injured employee for his reduced earning capacity, and, if an injury does not reduce his earning capacity, he is not entitled to compensation.

(*Sroka v. Industrial Comm'n* (1952), 412 Ill. 126, 128.) Fritz submits that claimant has failed to prove any reduction in his earning capacity attributable to the accident of May 12, 1982. Instead, Fritz maintains that claimant's inability to work at his trade is better explained by the state of the economy and the reduced market demand for electricians. We disagree.

It is axiomatic that liability under the Act cannot be based on speculation or conjecture but must be based solely on the facts contained in the record. (*Deichmiller v. Industrial Comm'n* (1986), 147 Ill. App. 3d 66, 74.) Claimant's "usual and customary line of employment" was that of a journeyman electrician. Although part of the time he would function in a supervisory capacity, as a journeyman electrician, he was required to perform tasks which clearly were beyond the restrictions placed on him by Dr. Conrad. Moreover, although there was testimony that hiring was down in the electrical trade, should such work be available, claimant was restricted in his ability to perform it.

Fritz argues that claimant unreasonably and unduly restricted his availability for work to jobs in which he was not required to lift more than 20 pounds, despite the fact that Dr. Conrad had increased the weight lifting to 75 pounds and Dr. Machek had found that claimant could perform his work without restriction.

It is for the Commission to decide which of the conflicting medical opinions in a case is to be accepted. (*Caterpiller Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 43.) Further, Dr. Conrad increased the amount of weight claimant could lift only with precautions that claimant must be careful and learn how to lift such weight. Given the sternness of those warnings and claimant's prior history, it does not appear unreasonable for claimant to avoid lifting the greater amount of weight even though it is medically authorized. Fritz' reliance on *Marek v. Industrial Comm'n* (1973), 55 Ill. 2d 323, is misplaced since in that case it was uncontradicted that the worker had refused to do light work which he was medically able to do and which was available. Here there is no evidence that claimant has turned down a job based upon the weight restriction.

Fritz also argues that the subsequent accident on March 29, 1984, necessitated further treatment for claimant and adversely affected his employability and search for employment. Fritz points to Dr. Conrad's testimony, wherein he stated that prior to the second accident, the restrictions he placed on claimant might only be temporary and concluded that the second accident aggravated the preexisting condition, the result of the accident of May 12, 1982. The claimant himself testi-

fied that he believed that the second accident aggravated his condition. However, there is also evidence in the record that claimant returned to work six weeks after the second accident and resumed his duties with no difficulty. Further, it was Dr. Machak's opinion that the second accident did not aggravate the first. Where the evidence is conflicting or of such a nature that different inferences may be drawn therefrom, a reviewing court will not disregard a reasonable inference drawn by the Industrial Commission merely because other inferences may be drawn. *Sterling Steel Casting Co. v. Industrial Comm'n* (1979), 74 Ill. 2d 273, 277.

■ Alternatively, Fritz maintains that if the wage loss award was proper, then the Commission erred in its calculation and assessment because: it was the union rule that prevented claimant from working and earning wages between January 5, 1985, and May 1, 1985, when his name reached the top of the out-of-work list; and an assessment of wage loss benefits for the duration of claimant's disability is contrary to law and the express language of the statute.

It is clear from the record that claimant was not restricted to the out-of-work list for employment. Through his own contacts and the aid of the rehabilitation counselor, provided to him by Fritz, he obtained employment with Sullivan Electric. He and the counselor sent out letters to prospective employers seeking job interviews. Thus, we disagree that the union rule prevented the claimant from obtaining employment.

Further, Fritz argues that the Commission erred in not limiting the award to age 65, thus implying that such loss could be a lifelong award long after his earning capacity would abate from retirement or nonrelated illness. However, the Commission merely quoted the language of section 8(d)(1) which provides that the awards are to be made "for the duration of his disability." (Ill. Rev. Stat. 1981, ch. 48, par. 138.8(d)(1).) Fritz has cited no cases requiring an interpretation of this statutory language other than its plain, ordinary meaning nor will we read into the statute any such requirement.

Finally, Fritz contends that the Commission erred in determining the wage loss was entirely due to the accident of May 12, 1982, and claimant's condition was only temporarily aggravated by the March 29, 1984, accident.

As we have previously noted in this opinion, the testimony concerning the affect of the second accident on claimant's condition was conflicting, and that in such cases, the reviewing court will not disregard the reasonable inferences drawn from the evidence by the Commission even though other inferences may also be drawn therefrom.

562

*Sterling Steel Casting Co.*, 74 Ill. 2d at 277.

Based upon all of the foregoing, we conclude that the decision of the Industrial Commission is not against the manifest weight of the evidence.

The judgment of the circuit court of Jackson County is affirmed.

Affirmed.

BARRY, P.J., and McCULLOUGH, McNAMARA, and CALVO, JJ., concur.